Docket No.: 12cv03211(CBA)(VMS)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------------------X

CLIFFORD M RIGAUD,

                                Plaintiff,

              -against-

THE CITY OF NEW YORK, THE NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY POLICE DEPARTMENT COMMISSIONER RAYMOND W. KELLY, individually and in his official capacity as Police Commissioner of the City of New York/New York City Police Department, NEW YORK CITY POLICE DEPARTMENT LIEUTENANT JASON MARGOLIS, Tax ID. 918540, individually and in his official capacity as a New York City Police Officer/Lieutenant, NEW YORK CITY POLICE DEPARTMENT DEPUTY INSPECTOR CHARLES MCEVOY, Tax ID 895710, individually and in his official capacity as a New York City Police Officer/Deputy Inspector, NEW YORK CITY POLICE DEPARTMENT SERGEANT DONALD KIPP, Tax ID 904278, individually and in his official capacity as a New York City Police Officer/Sergeant, NEW YORK CITY POLICE DEPARTMENT CAPTAIN TIMOTHY DHEEDENE, Tax ID 899139, individually and in his official capacity as a New York City Police Officer/Captain, NEW YORK CITY POLICE DEPARTMENT LIEUTENANT CHRISTOPHER GARCIA, Tax ID 903994, individually and in his official capacity as a New York City Police Officer/Lieutenant, NEW YORK CITY POLICE DEPARTMENT SERGEANT MICHAEL ZANELONE, Tax ID 921875, individually and in his official capacity as a New York City Police Department/Sergeant, NEW YORK CITY POLICE DEPARTMENT SERGEANT JOSE CAMACHO, individually and in his official capacity as a New York City Police Officer/Sergeant, NEW YORK CITY POLICE DEPARTMENT SERGEANT PHILLIP CONNERS, individually and in his official capacity as a New York City Police Officer/Sergeant, NEW YORK CITY POLICE DEPARTMENT OFFICER THERESA CALLAHAN, Tax ID 939453, individually and in her official capacity as a New York City Police Officer, and "JOHN DOES" and "JANE DOES", names being fictitious intended to be officers/representatives/agents/servants of the New York City Police Department, individually and in their official capacities,

                                Defendants.

------------------------------------------------------------------------------------X

**THIRD AMENDED COMPLAINT AND JURY DEMAND**

Plaintiff, Clifford Regard, (hereinafter "Plaintiff"), by and through his attorneys, DRUMMOND & SQUILLACE, PLLC, states as follows:

## INTRODUCTION

1. This is an action against Defendants to redress a pattern and practice of wrongful and unlawful conduct including, but not limited to: coordinated effort to secure the termination of Plaintiff s employment; coordinated efforts to penalize/punish the Plaintiff through the administrative channels/proceedings of the New York City Police Department; unlawful suspensions and re-suspensions of Plaintiff; unlawful termination of Plaintiff; unlawful hostile work environment, unlawful retaliation, unlawful disparate treatment and unlawful discrimination against Plaintiff based upon his religious belief/religion, national origin, color and/or race in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. Sections 19103, 19103(a), 2000, 2000(e), 2000(e)(3), 2000(e)-2(a)(I), New York Executive Law Art. 15 (NY Human Rights Law) and New York State Human Rights Law Sections 290-297; discrimination against the Plaintiff based upon his disability in violation of the American with Disabilities Act, 42, USC. Sections 1202, 12111(8), 12112(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. Sections 12111, et seq,; and unlawful discrimination against, hostile work environment against, unlawful retaliation against and unlawful termination of Plaintiff in violation of the Constitution of the State of New York and the Constitution of the United States of America.

2. Plaintiff is medically diagnosed as disabled in that Plaintiff suffers from Attention Deficit Disorder (ADD/ADHD) of which the Defendants herein named are aware of and were aware of before they commenced their continuous course and pattern of unlawful discrimination and hostile work environment against him because of same.    In addition, Plaintiff is of the

2

Muslim Religious faith of which the Defendants herein named are aware. During the course of his employment and continuing, Plaintiff was subjected to discrimination based upon his disability, religion, race, color and/or national origin about which Plaintiff exercised his right to register complaints about same and he complained to Defendants the City of New York, the New York City Police Department, including to his Chain of Command in the New York City Police Department and the New York City Police Department's internal Office of Equal Employment Opportunity (OEEO), but, to no avail. After Plaintiff complained of the foregoing, in response, Plaintiff was subjected to a continued course and pattern of unlawful hostile work environment, unlawful discrimination and unlawful retaliation in that the Defendants acting in concert each with the other and within the scope of employment embarked upon a systematic and coordinated effort to frustrate, harass, intimidate and punish the Plaintiff which culminated in Plaintiff's termination on or about May 22, 2013.

3.      In response to his complaints of hostile work environment, harassment, intimidation and discrimination, Plaintiff was told by one of the Defendants that the Plaintiff was "EDP" --- an emotionally disturbed person --- that he is not fit to wear the uniform and that none of the officers, including the Plaintiff's supervisors, liked him or wanted him in the command or on the force.

4.      As a direct and proximate result of the Defendants' wrongful and unlawful conduct Plaintiff had to seek medical treatment for the emotional distress he suffered and continues to suffer to present date.

5.      As a direct and proximate result of Defendants' wrongful and unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish, loss of the enjoyment of life,

emotional distress, (both intentional and negligent), deprivation of his civil rights and loss of income and retirement benefits, rights and privileges.

## JURISDICTION

6.     This action is brought pursuant to the Americans with Disabilities Act, 42 U.S.C. Sections 12102, 12111(8), 12112(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. Sections 12111, et seq., Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. Sections 1981, 1981(a), 2000, 2000(e), 2000(e)(3), 2000(e)-2(a)(1), 42 U.S.C. § 1983 and 42 U.S.C. § 1988, Fourteenth Amendment to the United States Constitution, 28 U.S.C. §§ 1331 and 1343, New York Executive Law Art. 15 (NY Human Rights Law), New York State Human Rights Law Sections 290-297, New York State Law 215-a.

## VENUE

7.     Venue is properly laid in the Eastern District of New York under U.S.C. § 1391(c), in that the defendant City of New York is a municipal corporation that resides in the Eastern District of New York and under 28 U.S.C. Section 1391(b).

## PARTIES

8.     Plaintiff   CLIFFORD   M.   RIGAUD,   (hereinafter   "Plaintiff")   is   a mulatto/AfroAmerican male, a citizen of the United States, who originated from the Caribbean Island of Haiti and at all relevant times a resident of the City and State of New York and is of Muslim Faith.  At all times herein mentioned the Defendants knew and/or had reasons to know that Plaintiff is Haitian, is a Mulatto/AfroAmerican male and is of the Muslim Faith.

9.     That Plaintiff is a member of a protected class under the laws and Constitution of the United States of America and the laws and Constitution of the State of New York.

10.     Plaintiff, up until on or about May 22, 2013, was a New York City Police Officer and was employed by the New York City Police Department since July 2002.

11.     Prior to the events set forth below, Plaintiff was a decorated New York City Police Officer and United States Army Veteran.

12.     From 1986 to 1995, Plaintiff served honorably in the United States Army and Army Reserve.

13.     During this time, Plaintiff received several commendations, including the "National Defense Service Medal" Army Service Medal, National Defense Service Medal, Overseas Service Ribbon, "South East Asia Service Medal, "Bronze Service star-2," "Army Commendation Medal, " "Expert Marksmanship Badge rifle m-16," "Marksmanship Badge Grenade," and the "First Good Conduct Medal."

14.     Plaintiff CLIFFORD M. RIGAUD received an honorable discharge from the United States Army on July 24, 1991 and Army Reserve until May 30 1995.

15.     That at all times herein mentioned, Defendant CITY OF NEW YORK (hereinafter "Defendant City") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

16.     That at all times herein mentioned, Defendant City maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

,

17.   That at all times herein mentioned, Defendant City was and is a governmental subdivision of the State of New York.

18.   That at all times herein mentioned, Defendant City is the public employer of Defendants the New York City Police Department, New York City Police Department Commissioner Raymond W. Kelly, New York City Police Department Lieutenant Jason Margolis, New York City Police Department Deputy Inspector Charles McEvoy, New York City Police Department Sergeant Donald Kipp, New York City Police Department Captain Timothy Dheedene, New York City Police Department Lieutenant Christopher Garcia, New York City Police Department Sergeant Michael Zanelone, New York City Police Department Sergeant Jose Camacho, New York City Police Department Sergeant Phillip Conners, New York City Police Department Officer Theresa Callahan, and "JOHN DOES" and "JANE DOES", names being fictitious intended to be police officers/representatives/agents/servants/employees of the New York City Police Department, all individually and in their official capacities.

19.   That at all times herein mentioned, Defendant, the NEW YORK CITY POLICE DEPARTMENT (hereinafter "Defendant NYPD") is an agency of Defendant City, existing and operating by virtue of the laws of the State of New York and the City of New York.

20.   That at all times herein mentioned, Defendant NEW YORK CITY POLICE DEPARTMENT COMMISSIONER RAYMOND W. KELLY (hereinafter "Defendant Kelly") is an agent, servant, officer, commissioner and/or employee of the Defendants City and NYPD and, at all times herein mentioned, acted in his individual capacity and in his official capacity as Police Commissioner for the City of New York and/or the New York City Police Department.

21.    That at all times herein mentioned, Defendants New York City Police Department Lieutenant Jason Margolis (hereinafter "Defendant Margolis"), New York City Police Department Deputy Inspector Charles McEvoy (hereinafter "Defendant McEvoy"), New York City Police Department Sergeant Donald Kipp (hereinafter "Defendant KIPP"), New York City Police Department Captain Timothy Dheedene (hereinafter "Defendant Dheedene"), New York City Police Department Lieutenant Christopher Garcia (hereinafter "Defendant Garcia"), New York City Police Department Sergeant Michael Zanelone (hereinafter "Defendant Zanelone"), New York City Police Department Sergeant Jose Camacho (hereinafter "Defendant Camacho"), New York City Police Department Sergeant Phillip Conners (hereinafter "Defendant Conners") and New York City Police Department Officer Theresa Callahan (hereinafter "Defendant Callahan") were and/or are each, individually and respectively, agents, licensees, servants, officers, sergeants, lieutenants, captains, deputy inspectors and /or employees of Defendants City and NYPD and, at all times herein mentioned, acted in their respective individual and official capacities and within the scope of their employment.

22.    That at all times herein mentioned, Defendants "John Does" and "Jane Does" are agents, licensees, servants, officers and/or employees of the Defendants City and NYPD and, at all times herein mentioned, acted in their respective individual and official capacities.

23.    In addition to the facts alleged in the foregoing paragraphs and following paragraphs, the individually named Defendants herein in the following subparagraphs are all sued in their individual and official capacities; all acted under color of law, each in concert with the other and/or each within the scope of their employment, to wit: under color of the statutes, ordinances, regulations, policies, customs and usages of the State of New York and/or the City of New York and/or of the New York City Police Department:

7

a. Defendant New York City Police Department Police Commissioner Raymond W. Kelly, was, at all relevant times, the Police Commissioner of the City of New York/New York City Police Department;

b. Defendant, New York City Police Department Lieutenant Jason Margolis, was, at all relevant times, a police officer of the New York City Police Department;

c. Defendant, New York City Police Department Deputy Inspector Charles McEvoy, was, at all relevant times, a police officer of the New York City Police Department;

d. Defendant, New York City Police Department Sergeant Donald Kipp, was, at all relevant times, a police officer of the New York City Police Department;

e. Defendant, New York City Police Department Captain Timothy Dheedene, was, at all relevant times, a police officer of the New York City Police Department;

f. Defendant, New York City Police Department Lieutenant Christopher Garcia, was, at all relevant times, a police officer of the New York City Police Department;

g. Defendant, New York City Police Department Sergeant Michael Zanelone, was, at all relevant times, a police officer of the New York City Police Department;

h. Defendant, New York City Police Department Sergeant Jose Camacho, was, at all relevant times, a police officer of the New York City Police Department;

i. Defendant, New York City Police Department Sergeant Phillip Conners, was, at all relevant times, a police officer of the New York City Police Department;

j. Defendant, New York City Police Department Officer Theresa Callahan, was, at all relevant times, a police officer of the New York City Police Department;

k. Defendants, "John Does" and "Jane Does", same being fictitious and intended to be New York City Police Officers, were, at all relevant times, New York City Police Officers, agents, servants and/or employees.

24.    That at all times herein mentioned, Defendant City owned, operated, managed, controlled, maintained, employed and/or supervised the Defendants NYPD, Kelly, Margolis, McEvoy, Kipp, Dheedene, Garcia, Zanelone, Camacho, Conners, Callahan, and "JOHN DOES" and "JANE DOES", names being fictitious intended to be police officers/representatives/agents/servants/employees of the New York City Police Department.

25.    That at all times herein mentioned, Defendant NYPD owned, operated, managed, controlled, maintained, employed and/or supervised the Defendants Kelly, Margolis, McEvoy, Kipp, Dheedene, Garcia, Zanelone, Camacho, Conners, Callahan, and "JOHN DOES" and "JANE DOES", names being fictitious intended to be police officers/representatives/agents/servants/employees of the NYPD.

26.    That at all times herein mentioned, Defendant Kelly owned, operated, managed, controlled, maintained, employed and/or supervised the Defendants Margolis, McEvoy, Kipp, Dheedene, Garcia, Zanelone, Camacho, Conners, Callahan, and "JOHN DOES" and "JANE DOES", names being fictitious intended to be police officers/representatives/agents/servants/employees of the NYPD.

27.    That at all times herein mentioned, Defendant Kelly, in his official capacity as and as the Police Commissioner for the Defendants City and NYPD, at all times herein mentioned, was and is an agent, servant, employee and/or licensee of said Defendants and, at all times herein mentioned, acted within the scope of his employment with and under color of law as

9

an agent, official, employee, Police Commissioner, licensee and/or servant of Defendants City and NYPD.

28.    That at all times herein mentioned, Defendants all acted within the scope of their employment, aced under the color of law, acted in concert one with the other and acted in accordance with and under their respective official titles and duties against Plaintiff herein.

29.    Defendants City, NYPD, Kelly, individually and in his official capacity, Margolis, individually and in his official capacity, McEvoy, individually and in his official capacity, Kipp, individually and in his official capacity, Dheedene, individually and in his official capacity, Garcia, individually and in his official capacity, Zanelone, individually and in his official capacity, Camacho, individually and in his official capacity, Conners, individually and in his official capacity, Callahan, individually and in her official capacity, and "JOHN DOES" and "JANE DOES", names being fictitious intended to Officers/representatives/agents/servants of the New York City Police Department, (hereinafter collectively referred to as "Defendants"), individually and in their official capacity, were duly sworn police officers, agents, servants and/or employees of the City of New York and/or New York City Police Department and at all times herein were acting in their individual capacity and/or as agents, servants, employees in their respective official capacity with all the actual and/or perceived/apparent authority granted, allotted, entrusted to them by the City of New York and/or New York City Police Department in according with their official duties and titles.

30.    That at all times herein mentioned, separate and apart from the entitlement and authority entrusted to him based upon his rank as a Lieutenant in arguably the most powerful Police Department in the world, Defendant Margolis is a highly influential member of the New

York City Police Department as same Defendant has held many powerful command positions and same Defendant served and/or is serving as President and/or has held and/or his holding high status titles/position and/or is a member of many New York City Police Department organization and other civic organizations.

31.  That at all times herein mentioned, the Defendants either individually/personally or through their employees, were acting under color of state law, acting in concert each with the other and/or in compliance with the official rules, regulations, laws, statutes, customs, usages, and/or practices of the State or City of New York when they engaged in the herein mention unlawful and discriminatory acts and practice against the Plaintiff.

32.  In addition to the facts alleged in the foregoing and following subparagraphs, the Defendants, are sued in their individual capacities and in their respective official capacities as agents, servants, licensees and/or employees of Defendants City and NYPD and for the purpose of the within action and at all times herein alleged, acted within the scope of their employment as agents, servants, licensees and/or employees of Defendants City and NYPD.

33.  Defendants employ more than fifteen (15) employees and are an "employer" as defined by the Americans with Disabilities Act, 42 U.S.C. Sections 12102, 12111(8), 12112(a), Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. Sections 12111, et seq., Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. Sections 1981, 1981(a), 2000, 2000(e), 2000(e)(3), 2000(e)-2(a)(1), New York Executive Law Art. 15 (NY Human Rights Law), New York State Human Rights Law Sections 290-297and the Laws of the State of New York and United States of America.

## EXHAUSTION OF CIVIL ADMINISTRATIVE PROCEDURES

34.    Plaintiff timely filed/registered/made his complaints with/to the Defendants City and NYPD's internal the Office of Equal Employment Opportunity (OEEO) and subsequently timely filed his complaint with the Equal Employment Opportunity Commission (EEOC) by filing a charge(s) of discrimination against Defendants for their unlawful discrimination, hostile work environment and retaliation by them against Plaintiff based upon Plaintiff's race, color, national origin, disability, religion and in unlawful retaliation for Plaintiff's exercising his right to register complaints about the workplace and, in particular, complaints about the Defendants' unlawful discrimination, retaliation and/or hostile work environment against him.    Plaintiff received a Notice of the Right to Sue from the EEOC and commenced the within action within 90 days of the receipt of his right to sue letter from the EEOC.

## JURY DEMAND

35.    Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## FACTUAL AND GENERAL ALLEGATIONS

36.    Moved by the horrible terrorist events of September 2001, in July 2002, Plaintiff joined the New York City Police Department.

37.    Three years after joining the NYPD, Plaintiff began working at the 103rd Precinct, where he remained until January 29, 2011.

38.    While at the 103rd Precinct, through his hard work and dedication to the Police Department, Plaintiff became the senior patrol officer while working in the 103rd Precinct and in

that capacity, Plaintiff was often sought out by other police officers for his knowledge, experience, and sound judgment in handling difficult work situations.

39.     From on or about July 2002 to on or about January 2009, Plaintiff had an exemplary record and received a number of commendations for his work as a police officer.

40.     In 2007, Plaintiff was awarded an "Excellent Police Duty Medal" for his outstanding performance as a Police Officer.

41.     Plaintiff first started experiencing unlawful discrimination in the year 2006 through 2007 when Defendant Lieutenant Jason Margolis (hereinafter "Defendant Margolis") became the Platoon Commander at the 103 Precinct.

42.     During that time, Defendant Margolis knew that the Plaintiff was of the Muslim Religious faith and, in the presence of Plaintiff, Defendant Margolis stated, in sum and substance, that: "Palestinians do not belong in the Middle East and that Muslims are to be blamed for a vast majority of the troubles of the world."

43.     Plaintiff believed that Defendant Margolis made the foregoing statement in the presence of the Plaintiff in an effort to harass, annoy, frustrate, alarm, be hostile and discriminatory against Plaintiff based upon Plaintiff's Muslim Religious faith.

44.     In response to Defendant Margolis' foregoing statement, Plaintiff informed same Defendant that Plaintiff would appreciate it if same Defendant refrained from anti Muslim/religious remarks in the workplace.  In addition, in 2007, Defendant Margolis repeatedly placed Plaintiff alone on foot patrol in an area which the Defendants the City and NYPD designated as a mandatory two police minimum patrol area due to the high level and serious nature the criminal activity in the area.  On or about 2006-2007, Plaintiff brought these concerns to PBA Delegate PO Pat Henry who met with Defendant Margolis to discuss Plaintiff's concerns

and complaints about the foregoing. Plaintiff believed at that point, that the meeting with PBA Delegate Pat Henry would resolve the matter. Unfortunately it did not resolved the problem and Defendant Margolis continued to give Plaintiff these kinds of assignments which gave Plaintiff no choice but to report/register his complaints to the 103rd Precinct Commander at the time, to wit: Inspector Michael Blake. Plaintiff specifically informed Inspector Michael Blake that Plaintiff believes that Defendant Margolis was carrying some personal grudge against Plaintiff based on Plaintiff's Muslim faith, Plaintiff's national origin (Haitian), Plaintiff's race and Plaintiff's disability. Inspector Blake informed the Plaintiff that he would address the Plaintiff's concerns/complaints with Defendant Margolis but as demonstrated herein, the matter was never addressed.

45.     In addition, Plaintiff requested of his PBA delegate to address the issue with Defendant Margolis and subsequently Plaintiff came to learn that the PBA delegate did in fact address the issue with Defendant Margolis and that, as a result of same, Defendant Margolis was highly agitated that Plaintiff had complained to the PBA Delegate about the foregoing.

46.     Thereafter, for reasons unknown to the Plaintiff, Defendant Margolis was no longer the Plaintiff's Platoon Commander and Plaintiff no longer reported to him.

47.     From January 2009 to December 2009 Sergeant McClinton-Young was Plaintiff's immediate supervisor to whom Plaintiff reported directly and who was charged with the responsibility of writing Plaintiff's annual performance evaluation.

48.     In September of 2009, Defendant Margolis became the day tour Platoon Commander of the 103rd Precinct and, as such, while Plaintiff did not directly report to Defendant Margolis, Defendant Margolis once again was within the Plaintiff's Chain of

Command. On or about the same time, Defendant McEvoy also became the Commander of the 103rd Precinct.

49.     In December 2009, Plaintiff received a positive annual evaluation report from his direct supervisor Sergeant McClinton-Young based upon Plaintiff's performance from January 1, 2009 to December 31, 2009. In the overall rater's comments of the annual evaluation report, Sergeant McClinton-Young notes that: "P.O. Riguard performs his duties in a efficient manner. P.O. Riguad is a conscientious worker who assumes personal responsibility for his work. P.O. Riguard follows directions and instructions and can be counted on to complete his assignments." *Annexed hereto and made a part hereof as Exhibit "A" is a copy of said positive evaluation.*

50.     Even though Defendant Margolis was not within the Plaintiff's Chain of Command for nine months of the foregoing evaluation period and was not in a capacity to observe the Plaintiff's duty performance even after same Defendant became the day tour Platoon Commander, same Defendant Margolis sought to have Sergeant McClinton- Young change her positive annual performance evaluation of the Plaintiff to a negative one.

51.     Since Sergeant McClinton-Young would not change her positive annual evaluation report of the Plaintiff, Defendant Margolis, on his own initiative, with Defendant McEvoy being the approving officer, even though they both were not in a position to observe the Plaintiff's duty performance and were not even in Plaintiff's Chain of Command for two thirds, some none months, of same evaluation period, gave Plaintiff a separate negative annual evaluation report. In the overall rater's comments of this separate negative annual evaluation report, Defendant Margolis notes, with Defendant McEvoy approving, that: "...P.O. Riguad must become more of a self starter and show better drive and initiative. PO Riguard also must improve his skills in terms of working with others in the platoon and in terms of his interactions with those he works with. In addition, PO Riguad must be more attentive to the instructions he is

given by his supervisors." *Annexed hereto and made a part hereof as Exhibit "B" is a copy of said negative evaluation by Defendant Margolis.*

52.     Plaintiff refused to sign Defendant Margolis' separate negative annual evaluation report and reported/complained about same to his Chain of Command and to Defendants City and NYPD that Defendant Margolis changed Plaintiff's evaluation report in retaliation for Plaintiff complaining to the PBA Delegate in 2006-2007 about same Defendant's harassing and anti-Muslim comments in 2006—2007.

53.     Plaintiff's Chain of Command and the Defendants City and NYPD took no action based upon or in response to Plaintiff's foregoing complaint.

54.     On January 12, 2010, the Island of Haiti suffered what many reports dubbed to be one of the deadliest earthquakes of all times. An estimated three million Haitians were affected by the quake where an estimated Three Hundred and Sixteen Thousand Haitians died, Three Hundred Thousand had been injured and One Million Haitians were made homeless.

55.     For several days leading into weeks after the earthquake, many Haitians were unaccounted for and many were trapped under the rubbles of collapsed homes and buildings. A massive rescue effort was undertaken with international daily media reports of survivors being pulled from under the rubbles and, unfortunately, reports of individuals who simply did not make it.

56.     As a result of the earthquake, Defendants the City and NYPD were seeking Police Officers who would volunteer to travel to Haiti to assist in security and recovery efforts.

57.     Following the aftermath of the earthquake, as many Haitians, Plaintiff had family members that were missing and/or unaccounted for.

58.    On January 17, 2010, Plaintiff reported to duty at the 103rd Precinct Roll Call Room where Defendant Margolis was conducting the Roll Call.

59.    During same Roll Call, Defendant Margolis knew and had reasons to know that the Plaintiff was Haitian, that Plaintiff was in fact present for the Roll Call and that Plaintiff had family and relatives living in Haiti who may have perished as a result of the earthquake.

60.    During same Roll Call, Defendant Margolis inquired, in sum and substance, if any officers were going to volunteer to travel to Haiti to assist with security and recover efforts as part of the Defendants City and NYPD's effort to assist with security and recovery efforts in Haiti.

61.    In response to Defendant Margolis' inquiry, a number of Police Officers in the Roll Call Room raised their hands indicating that they were volunteering to travel to Haiti to assist with the security and recovery efforts.

62.    Seeing the raised hands of the Police Officers in the Roll Call Room, Defendant Margolis remarked, in sum and substance, that same officers are assuming the risk because: "you all know how those Haitians are—they all have guns and they all like to shoot each other."

63.    Plaintiff believes that Defendant Margolis made the foregoing remarks to harass, annoy, alarm, frustrate, discriminate and/or create a hostile work environment for the Plaintiff based upon the Plaintiff's race, national origin, color, religion, disability and/or in retaliation against the Plaintiff for complaining to the Chain of Command about the hostile work environment created by same Defendant Margolis against him.

64.    On or about February 2, 2010, Plaintiff came to learned that Defendant Margolis had reassigned Plaintiff to SP-10 detail. SP-10 assignments are viewed by the NYPD and/or its

officers as undesirable duty assignments and are referred to as "Rookie Detail"— detail given to officers who are new to the force or junior to other officers at the command.

65.     At the time Defendant Margolis reassigned the Plaintiff to this SP-10 "Rookie Detail", the Plaintiff had been employed with Defendant NYPD for approximately eight years and there were many junior officers at the command at the time, including Defendant Callahan, who were junior in rank to the Plaintiff.

66.     After Roll Call on February 2, 2010, the Plaintiff approached Defendant Margolis and asked to speak to same Defendant privately relative to the SP-10 assignment and relative to the remarks that same Defendant stated about Haitians during the January 17, 2010 Roll Call. In response, Defendant Margolis turned his back to the Plaintiff and then, in a condescending fashion, stated to the Plaintiff in sum and substance that if this was about Plaintiff's assignment to SP-10 detail, that same Defendant Margolis is the Platoon Commander and can do whatever he wants with the duty assignment.

67.     In response, Plaintiff informed/reminded Defendant Margolis that same Defendant knew that Plaintiff is Haitian and that Plaintiff did not appreciate same Defendant's remarks regarding Haitians during the Roll Call of January 17, 2010.

68.     In response to Plaintiff, Defendant Margolis did not deny making the comments regarding the Haitians and did not apologize for making same but, instead, again in a condescending tone, told Plaintiff that if Plaintiff had a problem with same Defendant's comments, Plaintiff needed to go to Defendant NYPD's OEEO Department.

69.     Plaintiff complained to the Chain of Command and to Defendants City and NYPD about Defendant Margolis' remarks regarding Haitians and same Defendant's conduct in assigning the Plaintiff to "Rookie Details" as a means of punishing, harassing, alarming,

frustrating, discriminating against, creating a hostile work environment against and/or retaliating against Plaintiff based upon Plaintiff's, race, disability, color, national origin and/or in retaliation for Plaintiff exercising his right to register/make complaints about the conditions of the workplace including about the unlawful discrimination and hostile work environment by Defendants against him.

70.    It is common knowledge within the New York City Police Department that the most humiliating thing that the Command can do to a Police Officer is to demand that the Officer surrender his/her shield and gun.

71.    On February 5, 2010, upon return from Plaintiff's regular day off, immediately after Roll Call, Plaintiff was approached by a Lieutenant who informed the Plaintiff that Defendant Dheedene had directed same Lieutenant to order the Plaintiff to surrender his gun.

72.    Subsequently, Plaintiff was directed by Defendant Dheedene that Plaintiff is being ordered to attend to early intervention based upon what Defendant Dheedene attributed as "inappropriate behavior" by Plaintiff on April 27, 2009 and on February 2, 2010 which had been brought to his attention by Defendant Margolis.

73.    Defendant Dheedene refused to listen to anything Plaintiff had to say relative to the continued course of unlawful and discriminating, harassing, intimidating, alarming and hostile work environment that was being visited upon the Plaintiff at the hands of Defendant Margolis.

74.    Plaintiff was not allowed to explain his side of the story or to have a PBA Delegate present. Instead, Defendant Dheedene directed that Plaintiff be escorted immediately to One Police Plaza to the tenth floor to seek Early Intervention Unit's Detective Rodriguez.

75.    Upon arrival at One Police Plaza, Plaintiff was interviewed by a Sergeant and after Plaintiff explained the events that have led to Plaintiff being directed to early intervention, that Sergeant directed the Plaintiff to report the matter to Defendant NYPD's internal OEEO Department.    In response, Plaintiff stated that he had already reported the matter to Defendant NYPD's OEEO Department but, to no avail.

76.    The Sergeant then informed the Plaintiff that while he thought that the Plaintiff was the victim of discrimination, said Sergeant had no choice but to direct the Plaintiff to surrender his gun.

77.    On February 5, 2010, Plaintiff surrendered his gun to Defendants City and NYPD and, from said date to on or about May 22, 2013 when Plaintiff was unlawfully terminated, Defendants never returned Plaintiff's gun to Plaintiff.

78.    For each and every act/wrongdoing herein complained of, Plaintiff reported same to his Chain of Command, to the 103rd Precinct and to Defendants City and NYPD including to Defendant NYPD's internal OEEO Department with negative results, to no avail and with the Defendants' discriminatory, hostile and retaliatory practice/conduct continuing and/or escalating.

79.    Realizing the foregoing and that the discriminatory practice would continue, Plaintiff requested of Defendant Deputy Inspector Charles McEvoy a mutual transfer with another officer and same was denied by Defendant Deputy Inspector Charles McEvoy and/or by the Defendants and the New York City Police Department in the scope of their respective employment and in concert one with the other to further their desired goal of unlawful and discriminatory conduct against the Plaintiff.

80.     In retaliation for Plaintiff's complaints to the Chain of Command, to Defendants City and NYPD, including to NYPD's internal OEEO Department, Plaintiff was immediately retaliated against by Defendant McEvoy and Placed in Level One Monitoring.

81.     Defendant McEvoy told Plaintiff that he was doing well with his work but due to many Command Disciplines, Plaintiff was being placed on Level 1.

82.     Plaintiff, at all times mentioned herein, was a diligent police officer who was prepared to address any violations of the Laws of the State of New York.

83.     In March 2010, Plaintiff began to be scrutinized and increasingly pressured by the Defendants, specifically by Defendants Margolis and McEvoy to increase his "ACTIVITY"—to write more summons and to effectuate more arrests.

84.     Plaintiff was informed by the Defendants that if Plaintiff fails to write more summons and/or make more arrests, Plaintiff would again receive another low performance evaluations and tour/command reassignment.

85.     That Plaintiff took an oath to uphold the laws of the State of New York and the Constitution of the State of New York and, as such, cannot, did not and would not write a summons and/or effectuate an arrest without just, legal and/or probable cause.

86.     On March 22 2010, Plaintiff was summoned to a meeting with Defendants McEvoy and Margolis who both instructed and directed the Plaintiff to increase his "OVERALL ACTIVITY" to meet certain quota.     Specifically, Defendant McEvoy directed the Plaintiff to secure 25 summonses, three arrests per month and to conduct fifteen (15) 250s: Stop, Question and Frisks a month.

87. During the foregoing meeting, Defendants McEvoy and Margolis stated, in sum and substance, that: "a <u>lot of what you're evaluated on is by an activity by numbers.</u>"

88. In the foregoing meeting, Defendant McEvoy stated, in sum and substance, that he always conveys to his Lieutenant and Sergeants that it is all about the about numbers -- numbers, numbers -- number of arrests and number of summonses written. Defendant McEvoy further stated that he does not want "C" summonses, but wants certain summons and further said to Plaintiff: "You wrote quality C summons which we all know we do not write any more in this place." Said Defendant also hinted that Plaintiff should meet a quota by writing 25 summonses and conducting 15 250's a month.

89. Defendant McEvoy went on to tell the Plaintiff in same meeting that he expected a given number and specific kind of summonses from the Plaintiff each and every month otherwise the Plaintiff would receive a negative evaluation.

90. Plaintiff explained to the Defendants that, without his firearm and given the punitive assignments, such as SP-10 detail that was below the Plaintiff's rank in light of the number of subordinate officers within the Command, to have such a quota system is unlawful and beyond the practical.

91. Subsequent to the foregoing meeting, Defendant Zanelone gave Plaintiff very poor evaluations. These evaluations were given by Defendant Zanelone while acting in concert with Defendant Margolis and with the approval of Defendant McEvoy.

92. On November 11, 2010 Plaintiff was informed by the Precinct Commanding Officer that Plaintiff was being placed on Level I performance monitoring.

93. Subsequent to Defendants Margolis and McEvoy returning to the 103rd Precinct, the Plaintiff received numerous command disciplines for conduct that was not improper and for

events that were alleged to have occurred before the time period when these Defendants were in command.

94.     Due to Plaintiff's race, religion, color, national origin, and as a result of Plaintiff's effort to pursue an appeal of these command disciplines, and in furtherance of their unlawful discrimination, hostile work environment and retaliation against Plaintiff, the Defendants acting in concert one with each other, created an increasingly discriminatory, retaliatory and hostile work environment.

95.     In or about March 2010, Sergeant Pena wrongfully issued Plaintiff a command discipline for which Sergeant Pena admitted that he was forced to issue same against Plaintiff by Defendant Margolis.

96.     This foregoing command discipline was predicated upon an alleged failure to notify a Supervisor of a car accident where a member of service was involved, which is a must report from radio dispatch to the Patrol Supervisor of the day. However, the Patrol Supervisor was, in fact, properly notified and Sergeant Pena himself had responded to the accident scene.

97.     Plaintiff even started receiving command disciplines for events that transpired several months prior to Defendants McEvoy and Margolis assuming their positions with the 103rd Precinct. For example, in or about April 2009, Plaintiff had planned vacation with his family and submitted the proper request for same vacation. Plaintiff was led to believe that the vacation request was granted however, while Plaintiff was on vacation, Plaintiff received a telephone call from Sergeant Stephanie Clinton-Young directing the Plaintiff to return from vacation and report to work immediately and that Plaintiff must report to One Police Plaza on Easter Sunday, April 12, 2009.

98.     Plaintiff was informed by Sergeant Stephanie Clinton-Young that this directive for the Plaintiff to return from vacation and report to work was conveyed to her by Defendant Callahan and that Defendant Callahan was acting under the direction and authority of Lieutenant Conrad Seeger.

99.     Plaintiff subsequently learned upon returning from vacation that the reason Plaintiff was called off vacation is because Plaintiff is of the Muslim Religious faith and, as such, the Defendants acting in concert one with the other, and under color of law and within the scope of their employment, determined that Plaintiff should not be off for Easter and decided to direct Plaintiff to return from vacation.

100.     Thereafter, on April 27, 2009, Plaintiff was directed to report to One Police Plaza detail for/on April 28th and 29th of 2009. Plaintiff then asked Defendant Callahan what was the reason behind Plaintiff receiving such frequent detail to One Police Plaza as such duty was usually reserved for junior officers and not in such frequency.

101.     In response to Plaintiff's inquiry, Defendant Callahan just answered Plaintiff with a nasty tone: "oh well you got it." Plaintiff then went to speak to the Chain of Command as to him being assigned to this repeated detail but, despite his repeated efforts, Plaintiff was not able to speak to anyone within the Chain of Command about same.

102.     Plaintiff subsequently returned to Defendant Callahan to inquire as to the assignment and Defendant Callahan stated to Plaintiff in a loud tone of voice: "I feel you do not deserve to wear the uniform. The entire Supervisors here think you are an E.D.P (Emotional Disturbed Person) and the Police Officers do not like you."

103.     As a result of the foregoing, and in a continued course of harassment, discrimination and hostile work environment against Plaintiff, Defendant Callahan, who is of the

same rank as Plaintiff and a junior officer to Plaintiff in years on the job, engaged in back and forth banter with the Plaintiff and, Defendant Garcia, without addressing the issue as to why the Plaintiff was repeatedly given these "rookie assignments", stated that Plaintiff would be suspended.

104.    In or about June 2009, Plaintiff was notified by Defendant Garcia that Plaintiff was being assigned to Liberty Pool detail. When Plaintiff asked Defendant Garcia why he was getting this assignment, Defendant Garcia indicated that Plaintiff was getting the foregoing assignment because of the exchange that the Plaintiff had with Defendant Callahan relative to Plaintiff's inquiry of receiving "Rookie Details".

105.    Subsequently, Plaintiff inquired of Inspector Blake as to why Plaintiff was being punished for the foregoing inquiry and Inspector Blake explained that the detail was part of Plaintiff's punishment and Plaintiff, having been given an order, did do/work the Liberty Pool detail.

106.    Subsequently, Plaintiff was brought up on charges/specifications by Defendants City and NYPD, that were pending before Deputy Commissioner of Trials Martin G. Karopkin at One Police Plaza, at the direction of the Defendants acting in concert one with the other, within the scope of their employment and under color of law and, specifically, by Defendants Margolis and McEvoy. That the charges against Plaintiff were based upon allegations of conduct of allegedly being discourteous to other officers/supervisors, one charge of allegedly failing to report to duty/assignment and one charge of being inattentive.

107.    As a result of the foregoing, from April 27, 2009 until January 28, 2011, Plaintiff was placed on modified duty and reassigned to Viper One at the direction of Defendants acting

25

in concert one with the other and specifically, by/at the direction of Defendants Margolis and McEvoy.

108.   It is the custom and Practice of the Defendants City and NYPD to treat Plaintiff and other officers similarly situated in the foregoing fashion.

109.   Other officers of different race, religion, color, national origin and/or who are not disabled as Plaintiff are not treated in the foregoing manner as the Plaintiff for like conduct and/or similar behavior.

110.   On or about April 27, 2009, Plaintiff became the subject of a command discipline based upon allegations that he engaged in improper conduct within the workplace and that Plaintiff sought medical attention due to his disability.   This charge was predicated upon the Defendants acting in concert each with the other, under color law to discriminate against the Plaintiff based upon the Plaintiff's race, religion, national origin, color and/or disability, in their determined and continued effort to create a hostile work environment for the Plaintiff and in retaliation against the Plaintiff for registering/making complaints about the conditions of the workplace and the Defendants' unlawful conduct against him.   This charge was also predicated upon the Defendants acting in concert each with the other, under color of law and in retaliation against the Plaintiff because Plaintiff complained to each of the Defendants herein named and to his Chain of Command as to the hostile and discriminatory work environment that the Defendants herein named subjected and continued to subject the Plaintiff to.

111.   In or about July 2009, while Plaintiff was on Pool detail, another officer, Officer Lopez was overheard stating that: "because of that fucking Muslim (in reference to Plaintiff) I have the Liberty Pool detail today."

26

112.    On or about July 17, 2009, in exercising his right to complain about discriminatory practice at the workplace, Plaintiff filed a complaint of discrimination by Defendants with Defendants City and NYPD based upon the foregoing statement of Officer Lopez and based upon Plaintiff hearing other officers at the 103rd Precinct referring to the Plaintiff, in sum and substance, as: "this fucking Muslim guy." *Annexed hereto and made a part hereof as Exhibit "C" is a copy of said OEEO complaint.*

113.    On or about February 2, 2010, Plaintiff became the subject of a command discipline based upon allegations that the Plaintiff was discourteous to the Defendant Margolis. This charge was predicated upon the Defendants acting in concert each with the other, under color law, to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin and/or disability and in their determined and continued effort to create a hostile work environment for the Plaintiff and to retaliate against the Plaintiff.   This charge was also predicated upon the Defendants acting in concert each with the other, under color of law and in unlawful retaliation against the Plaintiff because the Plaintiff exercised his right to register complaints about the conditions of the workplace and because he complained to each of the Defendants herein named as well as to his Chain of Command as to the hostile and discriminatory work environment that the Defendants herein named subjected and continued to subject the Plaintiff to.

114.    On February 25, 2010, as the Defendants City and NYPD, in exercising their custom and practice, failed to address, correct or remedy Plaintiff's complaints about the Defendants' unlawful, discriminatory, hostile and retaliatory work environment, Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission (EEOC) stating that Defendants and in particular, Defendant Margolis, discriminated against him based upon his

religion, his national origin and unlawfully retaliated against him. *Annexed hereto and made a part hereof as Exhibit "D" is a copy of said EEOC Complaint.* In said EEOC Charge, Plaintiff charged and set forth that the Defendants, including Defendants Margolis and Garcia, unlawfully discriminated against him based upon his national origin of being Haitian, his religion of being Muslim, and unlawfully retaliated against him including acts/incidents that occurred in April 2009 (in calling him back from vacation to work on Easter because he is Muslim) and June 2009. <u>See</u> Exhibit "D", above. In same Charge, Plaintiff set forth that he also filed a complaint about same against the Defendants with the NYPD EEO office. <u>See id.</u>

115.    As part of their continued effort to discriminate against the Plaintiff due to Plaintiffs, race, religion, color, national origin disability and in retaliation and, in their determined effort to subject Plaintiff to a hostile work environment, in or about 2010 to 2011, the Defendants, specifically Defendant Margolis and Zanelone, informed Plaintiff's partner, Police Officer Michelle Alexander, that she will suffer the same fate as the Plaintiff if she did not make efforts to distance herself from the Plaintiff and to no longer serve as Plaintiff's partner.

116.    Subsequently, Police Officer Michelle Alexander became the target of sexual harassment by Defendant Margolis and has also been the subject of several punitive and disciplinary actions at the hands of the Defendants acting in concert each with the other and in their determined and continued effort to discriminate against the Plaintiff based upon the Plaintiff's race, religion, color, national origin, disability and in their determine effort to create a hostile work environment for the Plaintiff and to retaliate against him.

117.    On or about April 15, 2010, <u>less than two (2) months after Plaintiff filed the February 25, 2010 EEOC Charge against the Defendants,</u> Plaintiff became the subject of another

command discipline based upon allegations that Plaintiff was inattentive while on security post and was observed using an unauthorized personal cellular telephone. This charge was predicated upon the Defendants acting in concert each with the other, under color of law, to discriminate against the Plaintiff based upon based upon the Plaintiff's race, religion, color, national origin, disability, in their determined and continued effort to create a hostile work environment against/for the Plaintiff and in unlawful retaliation against the Plaintiff for Plaintiff exercising his right to register complaints about the conditions of the workplace and, in particular, to register complaints about the Defendants' unlawful conduct against him.

118. On or about October 30, 2010, <u>eight (8) months and five (5) days after Plaintiff filed the February 25, 2010 EEOC Charge against the Defendants,</u> Plaintiff became the subject of another command discipline based upon allegations that the Plaintiff failed to report to his assigned duty station. This charge was predicated upon the Defendants acting in concert each with the other, under color law, to discriminate against the Plaintiff based upon based upon the Plaintiff's race, religion, color, national origin, disability, in their determined and continued effort to create a hostile work environment for the Plaintiff and in unlawful retaliation against the Plaintiff for Plaintiff's exercise of his right to register complaints about the conditions of the workplace and, in particular, to complain about the Defendants' unlawful conduct against him. This charge was also predicated upon the Defendants acting in concert each with the other, under color of law and in retaliation against the Plaintiff because the Plaintiff complained to each of the Defendants herein named as well as to his Chain of Command about the hostile, retaliatory and discriminatory work environment that the Defendants herein named subjected and continued to subject the Plaintiff to.

119.    On or about January 28, 2011 and continuing, Plaintiff became the subject of a command discipline based upon allegations that the Plaintiff was discourteous to Defendant McEvoy. This charge was predicated upon the Defendants acting in concert each with the other, under color of law, to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin, disability, in their determined and continued effort to create a hostile work environment for/against the Plaintiff and to unlawfully retaliate against the Plaintiff for exercising his right to register complaints about the workplace and, in particular, about the Defendant's unlawful conduct against him.    This charge was also predicated upon the Defendants acting in concert each with the other, under color of law and in retaliation against the Plaintiff because the Plaintiff complained to each of the Defendants herein named as well as to his Chain of Command about the hostile, retaliatory and discriminatory work environment that the Defendants herein named subjected and continued to subject the Plaintiff to.

120.    On January 31, 2011, Plaintiff, in exercising his right to complain about discriminatory practice at the workplace, filed a complaint of discriminatory practice by the Defendants with Defendants City and NYPD asserting unlawful race discrimination and retaliation by the Defendants and, in particular, by Defendants McEvoy and Margolis. *Annexed hereto and made a part hereof as Exhibit "E" is a copy of said OEEO complaint.* In said OEEO complaint, Plaintiff set forth and complained that Defendant McEvoy called Plaintiff by Plaintiff's first name and that said Defendant told Plaintiff he could call Plaintiff whatever he wanted and that he was giving him a Command Discipline from Defendant Kipp and another one from him. See Exhibit E", above. Defendant McEvoy further told Plaintiff to wait until said Defendant could find a way to suspend him and, in retaliation, modified Plaintiff's duty and transferred Plaintiff out of the 103rd Precinct. See id.

30

121.    That the Defendants' unlawful conduct against the Plaintiff and Defendants City, and NYPD's failure to address, remedy, intervene, stop and/or prevent the unlawful conduct of the Defendants herein complained of by the Plaintiff renders such unlawful conduct and/or acceptance of said unlawful conduct, the custom and practice of the Defendants City and NYPD.

122.    That it is the custom and practice of Defendants City, NYPD and Kelly, as well as their officers, agents, and/or employees, to act under color of law to discriminate against the Plaintiff and others similarly situated as Plaintiff based upon race, religion, color, national origin and disability.

123.    That it is the custom and practice of Defendants City, NYPD and Kelly, as well as their officers, agents and/or employees, to act under color of law and retaliate against the Plaintiff, and others similarly situated as Plaintiff, because the Plaintiff and others similarly situated as the Plaintiff register complaint(s) to the Chain of Command, to Defendants City and NYPD about the conditions of the workplace and, in particular, about the hostile, retaliatory and discriminatory work environment that the Defendants herein named subjected and continued to subject the Plaintiff and others similarly situated as the Plaintiff to.

124.    That on or about September 20, 2011, less than eight (8) months after Plaintiff filed the January 31, 2011 OEEO Complaint against Defendants, in further retaliation, hostile work environment and discrimination against the Plaintiff, the Defendants appeared, presented, testified and prosecuted the Plaintiff in Departmental Hearings based upon the aforementioned charges and specifications brought by Defendants against him, in furtherance of their unlawful conduct and in acting in concert each with the other to continue to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin and disability and in unlawful

retaliation for Plaintiff exercising his right to register complaints about the Defendants' unlawful conduct against him. *Annexed hereto and made a part hereof as Exhibit "F" are the trial/hearing charges and specifications brought by Defendants against Plaintiff.*

125.    That on or about October 25, 2011, in further retaliation, hostile work environment and discrimination against the Plaintiff, the Defendants again appeared, presented, testified and prosecuted the Plaintiff in Departmental Hearings in furtherance of their unlawful conduct and in acting in concert each with the other to continue to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin and disability and in unlawful retaliation against him for exercising his right to register complaints about the Defendants' unlawful conduct against him.

126.    On November 1, 2011, Plaintiff, in exercising his right to complain about discriminatory practice at the workplace filed a complaint of discriminatory practice by the Defendants with the United States Equal Employment Opportunity Commission asserting discrimination by Defendants and in particular, by Defendants McEvoy and Margolis based upon Plaintiff's race, disability, religion, retaliation and color. *Annexed hereto and made a part hereof as Exhibit "G" is a copy of said EEOC complaint.* In same EEOC Charge, Plaintiff set forth and detailed that in January 2011, the Defendants downgraded his evaluation to a 2.5; that because he was Muslim he was retaliated against by being issued more disciplines, modified at work and punished more than the "norm" that other officers who are not his religion or race were; and that, before February 2009, he did not have many discipline issues or problems until he requested a religious accommodation (as being Muslim) to be allowed to wear/grow a beard. See Exhibit "G", above. In same November 1, 2011 EEOC Charge of Discrimination against the Defendants, Plaintiff further set forth that other specifically named Caucasian officers who were

not of his race, national origin or religion were not treated unlawfully and/or were treated better by Defendants than the way they treated him. See id.

127.    That on or about November 3, 2011, <u>two (2) days after Plaintiff filed the November 1, 2011 EEOC Charge against the Defendants</u>, in further retaliation, hostile work environment and discrimination against the Plaintiff, the Defendants again appeared, presented, testified and prosecuted the Plaintiff in Departmental Hearings in furtherance of their unlawful conduct and in acting in concert each with the other to continue to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin and disability and in unlawful retaliation against Plaintiff for exercising his right to register complaints about the Defendants' unlawful conduct against him.

128.    That on or about December 8, 2011, in further retaliation, hostile work environment and discrimination against the Plaintiff, the Defendants again appeared, presented, testified and prosecuted the Plaintiff in Departmental Hearings in furtherance of their unlawful conduct and in acting in concert each with the other to continue to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin and disability and in unlawful retaliation against Plaintiff for exercising his right to register complaints about the Defendants' unlawful conduct against him.

129.    That on or about January 12, 2012, in further retaliation, hostile work environment and discrimination against the Plaintiff, the Defendants again appeared, presented, testified and prosecuted the Plaintiff in Departmental Hearings in furtherance of their unlawful conduct and in acting in concert each with the other to continue to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin and disability and in unlawful

retaliation against Plaintiff for exercising his right to register complaints about the Defendants' unlawful conduct against him.

130.     On January 17, 2012, Plaintiff, in exercising his right to complain about discriminatory practice at the workplace, filed a Charge, EEOC Charge No.: 520-2012-00260, charging discriminatory practice by the Defendants with the United States Equal Employment Opportunity Commission asserting discrimination by Defendants and in particular, by Defendants McEvoy and Margolis based upon Plaintiff's race, disability, religion, national origin and in unlawful retaliation. *Annexed hereto and made a part hereof as Exhibit "H" is a copy of said EEOC Charge of Discrimination; Charge No.: 520-2012-00260.* Plaintiff set forth and charged that said unlawful conduct/treatment by Defendants against Plaintiff was a continuing action. See Exhibit "H", above.  In same EEOC Charge, Plaintiff set forth and charged that Defendants Margolis and McEvoy lowered his performance evaluation; that it was not the normal course of evaluation to have an evaluation from two different supervisors in one year; that Defendant McEvoy discriminated against him because of his Muslim religious faith, his race, national origin and color (being Haitian and dark skinned) and that the Defendants were retaliating against him. See id. Plaintiff further set forth that prior to February 2009 when he requested a religious accommodation to grow/wear a beard for his Muslim faith, and prior to Defendant Margolis becoming his Platoon Commander, Officer Rigaud did not have disciplinary issues or problems but since same, he has been subjected to increased disciplines and punishments.     See id.     Officer Rigaud further set forth Defendant Margolis' unlawful discriminatory remarks about Haitians from the January 2010 Roll Call and that he knows Plaintiff to be disabled and is subjecting him to a hostile work environment. See id. Plaintiff also set forth that he is being retaliated against by Defendants McEvoy and Margolis because of

34

his prior exercising of his rights to register EEO complaints against them and that, despite Plaintiff receiving a positive report from supervisors as well as from his treating doctor, the Advocate's Office chose to continue to wrongfully, and in an effort to continue the Defendants' unlawful discrimination, harassment, hostile work environment and retaliation, prosecute the Plaintiff. See id.

131.    On January 30, 2012, the U.S. Equal Employment Opportunity Commission sent Plaintiff a confirmation/acknowledgement of receipt and filing of Plaintiff's EEOC Charge No.: 520-2012-00260, charging Defendants with violations of Title VII of the Civil Rights Act and violation of the Americans with Disabilities Act based upon Plaintiff's January 17, 2012 Charge, EEOC Charge No.: 520-2012-00260. *Annexed hereto and made a part hereof as Exhibit "I" is a copy of the January 30, 2012 EEOC letter of confirmation/acknowledgement of Title VII and ADA charges against the Defendants.*

132.    That on or about February 9, 2012, twenty three (23) days after Plaintiff filed the January 17, 2012 EEOC Charge against the Defendants and ten (10) days after the EEOC confirmed same charging the Defendants with violations of Title VII of the Civil Rights Act and of the ADA, in further retaliation, hostile work environment and discrimination against the Plaintiff, the Defendants again appeared, presented, testified and prosecuted the Plaintiff in Departmental Hearings in furtherance of their unlawful conduct and in acting in concert each with the other to continue to discriminate against the Plaintiff based upon Plaintiff's race, religion, color, national origin and disability and in unlawful retaliation against Plaintiff for exercising his right to register complaints about the Defendants' unlawful conduct against him.